# In the United States Court of Federal Claims

No. 11-490C

Filed: July 29, 2011

(Reissued: August 9, 2011)[1]

_____

| | |
|---|---|
| THE GEO GROUP, INC., | * |
| | * |
| Plaintiff, | * Post-award bid protest; Application for |
| | * temporary restraining order; Likelihood of |
| v. | * success; Procurement Integrity Act |
| | * inapplicable to situation presented; |
| THE UNITED STATES, | * Organizational Conflict of Interest (OCI) – |
| | * unequal access to information; No OCI |
| Defendant, | * where information obtained by former |
| and | * employee from his former employer; |
| | * Irreparable injury; Balancing of harms; |
| COMMUNITY FIRST SERVICES, INC., | * Public interest; Application denied. |
| | * |
| Defendant-Intervenor. | * |

_____

**ORDER DENYING APPLICATION FOR TEMPORARY RESTRAINING ORDER**

_____

*Matthew H. Kirtland*, Fulbright & Jaworski, LLP, Washington, D.C., for plaintiff.

*Devin A. Wolak*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

*Jonathan D. Shaffer*, Smith, Patchter, McWhorter, PLC., McLean, VA, for defendant-intervenor.

_____

[1] An unredacted version of this opinion was is9sued under seal on July 29, 2011. The parties were given an opportunity to propose redactions, but no such proposals were made. Nonetheless, the court has incorporated some minor changes into this opinion.

**ALLEGRA, Judge:**

This post-award bid protest case is before the court on plaintiff's application for a temporary restraining order. After careful consideration of the memoranda filed by the parties, and for the reasons discussed below, the court hereby **DENIES** plaintiff's application.[2]

## I.   BACKGROUND[3]

Since 1989, GEO Group, Inc. (GEO) (or a predecessor corporation) has held a contract with the Bureau of Prisons (BOP) to run a residential reentry facility in Brooklyn, New York (the Brooklyn Facility). That contract is set to expire on July 31, 2011. On January 16, 2009, BOP issued RFP-200-1042-NE, soliciting proposals for the provision of residential reentry services in Brooklyn or Queens, New York.

Thereafter, GEO assembled a team to draft a bid submission. That team included Jack Brown, a GEO vice-president who had overall supervisory responsibility for GEO's existing BOP contract. By virtue of his role in the bid submission process, Mr. Brown had access to sensitive competitive information. For example, he received copies of the following: (i) CSC's Brooklyn Facility staffing plan from its last rebid; (ii) GEO's Bronx facility staffing plan from its last RRC rebid; (iii) GEO's Bronx facility weekly schedule, (iv) GEO's Bronx facility personnel resource plan; and (v) various documents relating to GEO's relationships with the communities in which its reentry facilities were located. More importantly, according to GEO officials, Mr. Brown also had access to all the information used by GEO in crafting its response to the RFP, including GEO's staffing costs, expenses, per diem rates and other proposed costs. During the first week of March 2009, Mr. Brown met with other GEO officials to review GEO's draft proposal line-by-line. He then abruptly resigned on March 13, 2009.

There are indications that the timing of this resignation was not coincidental. Responses to the RFP were due on March 18, 2009. GEO submitted its response on March 16, 2009; on March 18, 2009, BOP received a second response to its RFP from Community First Services (CFS). During his evaluation of the proposals, the contracting officer (CO) found a number of instances in which the wording of the two proposals was almost identical. At the contracting officer's recommendation, the procurement was placed on hold while this matter was investigated. At or around the same time, GEO learned that Mr. Brown had left its employ to work at CFS, a company that he had apparently founded in 2005 and kept active throughout his employment with GEO. Based upon this information, GEO notified BOP of what it believes was a potential violation of the Procurement Integrity Act, 41 U.S.C. § 423. The Justice Department's Office of the Inspector General (OIG) investigated this matter. On January 18,

---

[2]   Owing to the urgent need of the parties for a ruling on this matter, the court's recitation of the facts and law is necessarily brief.

[3]   This summary of the facts is derived from plaintiff's complaint and from materials attached to the parties' memoranda. The administrative record has not yet been filed in this case.

2010, OIG issued a report concluding that no theft of GEO property or proprietary information, bid-rigging or other procurement integrity violations had occurred.

At this point, the procurement moved forward. BOP conducted three rounds of discussions with the offerors, during which time, GEO and CFS both amended their pricing proposals. Following the completion of evaluations, the CO made a "best value" determination. On February 16, 2011, BOP announced that it had awarded the contract to CFS.

On February 28, 2011, plaintiff filed an agency protest of the award to CFS. On April 8, 2011, BOP denied plaintiff's protest. On April 18, 2011, plaintiff filed a bid protest at the General Accountability Office (GAO). This protest was denied on July 26, 2011. On July 27, 2011, plaintiff filed suit in this court seeking an injunction setting aside the award to CFS, filing with its complaint the subject application for a temporary restraining order, as well as a motion for preliminary injunction. On July 28, 2011, the court conducted a status conference in this matter, at which it granted CFS's motion to intervene. Pursuant to an order entered after the conference, earlier today, defendant and CFS filed oppositions to plaintiff's application for a temporary restraining order.

## II.   DISCUSSION

Plaintiff seeks a temporary restraining order enjoining defendant from beginning performance of the new contract.

We begin with common ground. In order to obtain a temporary restraining order, a party must show: (i) it will suffer irreparable injury unless the order issues; (ii) the threatened injury to it outweighs any damage to the opposing party; (iii) the temporary restraining order, if issued, will not be adverse to the public interest; and (iv) a substantial likelihood exists that it will prevail on the merits. *See Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 536 (2003); *EDP Enters., Inc. v. United States*, 56 Fed. Cl. 498, 499 (2003); *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001). A temporary restraining order is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948, at 129-30 (2d ed.1995)); *see also Software Testing Solutions*, 58 Fed. Cl. at 536; *Minor Metals, Inc. v. United States*, 38 Fed. Cl. 379, 381 (1997) (citing *Golden Eagle Refining Co. v. United States*, 4 Cl. Ct. 622, 624 (1984)). In the instant case, the absence of any indicated likelihood of success on the merits, as well as the balancing of harms and the public's interest, leave little doubt in the court's mind that the pending application should be denied. Of course, a few words of elaboration are in order.

### A.   Likelihood of Success

For reasons that will become apparent, the court will consider the last of the four injunctive factors – likelihood of success – first. In a bid protest case, this court will enjoin the government only where an agency's actions were arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4). By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 104-05 (1983). Accordingly, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)).

It is the burden of the aggrieved bidder to demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations. *See Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 42 (1997); *Aero Corp. v. United States*, 38 Fed. Cl. 739, 749 (1997). Further, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

GEO's banner claim is that one of its former officials pirated critical information from its internal files and bid proposal and used that information in crafting CFS' winning proposal. It asserts that the contracting officer acted arbitrarily and contrary to law in awarding CFS the contract because violations of the Procurement Integrity Act, 41 U.S.C. § 423, and organizational conflicts of interest should have disqualified CFS from receiving an award. A preliminary review of the law, however, suggests otherwise.

For one thing, there is no indication that Mr. Brown's actions gave rise to a violation of the Procurement Integrity Act. The provision that plaintiff claims was violated is 41 U.S.C. § 423(b), which states: "A person shall not, other than as provided by law, knowingly obtain contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." A violation of this provision can be the basis for "a protest against the award or proposed award of a Federal agency procurement contract . . . ." *Id*. at 423(g). Read in context, however, the quoted language, like the other provisions in section 423, appears to apply only to current or former officials of the United States or persons who are acting or have acted on such an individual's behalf. As plaintiff is quick to point out, that conclusion is not apparent from the statutory language, which merely refers generically to a "person." But, this conclusion is supported by the overall structure of the statute, including the definitions therein of "bid and proposal information" and "source selection information," both of which talk in terms of specific information obtained by a Federal agency. *See* 41 U.S.C. § 423(f)(1)-(2). Here, of course, Mr. Brown did not obtain the information in question from BOP or any other government source, but rather from GEO itself. The conclusion, moreover, that section 423(b) applies only to government employees and their

agents derives support from the legislative history of the statute, which refers to the provision in question as applying to "present or former federal employees," H. Conf. Rep. No. 104-450, at 969 (1996), and from the Federal Acquisition Regulations (FAR) that implement this provision, *see* 48 C.F.R. § 3.104-4.[4]

In addition, GEO appears wrong in contending that Mr. Brown's actions gave rise to an unmitigated organizational conflict of interest. To be sure, the FAR tasks contracting officers with the responsibility to "analyze planned acquisitions in order to – (1) [i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and (2) [a]void, neutralize, or mitigate significant potential conflicts before contract award." 48 C.F.R. § 9.504(a); *see NetStar-1 Gov't Consulting, Inc. v. United States*, 2011 WL 2307659, at *2 (Fed. Cl. June 13, 2011). Among the organizational conflicts of interest identified by the FAR are those involving unequal access to information, which arise when the contractor has access to "[s]ource selection information . . . that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract." 48 C.F.R. § 9.505-4; *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 569 (2010). This and other FAR provisions, however, make clear that a conflict based upon unequal access to information arises only where the information is obtained through performance of a government contract. 48 C.F.R. §§ 9.505(b); 9.505-4, 9.508; *see also Turner Constr. Co.*, 94 Fed. Cl. at 569. There is no indication – and plaintiff cites no authority to this effect – that such a conflict arises when an individual takes information about his former employer to his new employer.[5] Indeed, the GAO has, on multiple occasions, ruled to the contrary.[6] Accordingly, at this juncture, there do not appear to be any grounds to set aside the award to CFS based on the existence of an unmitigated organizational conflict of interest.

---

[4] Even if the court were ultimately to conclude that the Procurement Integrity Act covered conduct of an individual not associated with the United States, there is significant evidence that Mr. Brown did not have access to GEO's pricing information. Indeed, it appears that the OIG concluded this in declining to pursue this matter further. Such a finding would deprive plaintiff's argument of much of its vitality, as its claim is that Mr. Brown used his knowledge to craft a proposal for CFS that had price lower than that offered by GEO.

[5] In contending otherwise, plaintiff cites extensively to this court's recent decision in *NetStar-1*. But, in that case, the organizational conflict of interest appeared to arise as the result of information that a winning bidder received from the affected agency. *NetStar-1*, 2011 WL 2307659 at *3. Such is not the case here.

[6] *See, e.g., Ellwood Nat'l Forge Co.*, 2010 C.P.D. ¶ 250 (2010) ("where information is obtained by one firm directly from another firm – by, for example, dissemination of information by former employees – this essentially amounts to a dispute between private parties that we will not consider absent evidence of government involvement"); *LLH & Assocs.*, 2006 C.P.D. ¶ 52 (2006) (same); *Applied Comms. Research, Inc.*, 96-1 C.P.D. ¶ 145 (1996); *Olin Corp.*, 93-1 C.P.D. ¶ 428 (1993).

Plaintiff's remaining contentions of error relate to its disagreements with the CO's evaluation of its past performance and of CFS' ability to perform the contract. But, plaintiff has not shown that the actions taken by the CO were arbitrary and capricious. Its mere disagreements are not enough. *See Banknote Corp. v. United States*, 56 Fed. Cl. 377, 384 (2003) ("[A]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." (quotation and citation omitted)); *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 660 (2002) ("[N]aked claims, by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that . . . findings were the product of an irrational process and hence arbitrary and capricious."). Particularly erroneous is plaintiff's assertion that the CO could not find CFS responsible based upon its lack of prior experience. The authority on this point is quite to the contrary. *See* 48 C.F.R. § 9.104-1(c) ("[a] prospective contractor shall not be determined . . . nonresponsible solely on the basis of a lack of relevant performance history"); *see also Al Qabandi United Co.*, 2008 C.P.D. ¶ 112 (2008).[7]

Accordingly, this court concludes that plaintiff has not demonstrated a likelihood of success on the merits. Should this case proceed, much more will need to be shown to demonstrate that plaintiff is entitled to relief.

### B. Irreparable Injury

Likewise tenuous is plaintiff's claim that it will be irreparably harmed if the court does not issue a temporary restraining order. When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993); *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 717 (2006). This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm. *See PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003); *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 744 (2000); *Seattle Sec. Servs.*, 45 Fed. Cl. at 571.

Plaintiff has not demonstrated, however, that it will lose the opportunity to compete for the contract in question if the court does not grant some form of temporary injunctive relief. To be sure, plaintiff indicates that it will begin laying off personnel on August 1, 2011, if its current contract is not extended. But, plaintiff does not allege that the termination of the current contract will prevent it from competing for the new contract should it ultimately convince the court to set aside the award to CFS. Indeed, there is strong indication that GEO will remain an active competitor for the contract in question. Thus, as part of its bid proposal, GEO emphasized that it

---

[7] GEO also challenges the CO's responsibility determination on the basis that Mr. Brown's conduct evidenced an unsatisfactory "record of integrity and business ethics." 48 C.F.R. § 9.104-1(d). However, it appears that the CO was fully aware of the circumstances surrounding the allegations against Mr. Brown, including the findings made by OIG, and there is no reason to believe, at this time, that he did not factor those circumstances into his determination.

then was operating sixty-four correctional, detention, and special needs facilities, employing over 13,000 individuals.   Accordingly, there is no indication that the immediate loss of the current contract will lead to GEO's demise or otherwise prevent it from participating effectively on any further competition for the facility in question.

GEO claims that thirty of its employees will be dismissed if its Brooklyn Facility closes. That, of course, is no trifling matter.  But, those employees presumably will be rehired if GEO ultimately receives the contract in question – and perhaps some of them may be transferred temporarily to one of GEO's many remaining facilities.  Moreover, it cannot be overlooked that the temporary loss of these jobs derives primarily from GEO's decision to await the conclusion of its GAO protest before filing suit in this court.  GEO has admitted that it knew that the timing of the GAO decision was such that it would have, at best, a few days before the termination of the existing contract in which to file suit in this court and obtain a temporary restraining order. Had it filed suit a month or so earlier, its suit in this court could have been fully resolved before the existing contract expires.[8]  But, it did not.  And the court is ill-inclined, at this late hour, to pull GEO's chestnuts out of a fire sparked by its own ill-fated tactical decisions.  *Second City Music, Inc. v. City of Chicago.*, 333 F.3d 846, 850 (7th Cir. 2003) ("self-inflicted wounds are not irreparable injury"); *Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("[w]e will not consider a self-inflicted harm to be irreparable").[9]

Moreover, this case is different than most in that GEO has the potential for recouping at least some of the damages that will be incurred if performance of the new contract is allowed to proceed.  While GEO cannot recover those damages from the United States, it has filed suit in the United States District Court for the Eastern District of New York seeking a range of civil damages from Mr. Brown, CFS, and others.  *See GEO Group, Inc. v. Community First Services, Inc.*, 1:11-cv-01711-CBA-CLP (E.D.N.Y.).  Thus, it is conceivable that a significant part of the injuries that GEO may suffer if the new contract is allowed to proceed may be addressable by a subsequent monetary award.  It is, of course, axiomatic that "[t]he availability of adequate monetary damages belies a claim of irreparable injury."  *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988); *see also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (no irreparable injury where plaintiff "could be adequately

---

[8] GEO is simply wrong in contending that once it initiated the GAO protest, it could not file suit here.  While GEO could not maintain its protest at GAO **and** pursue an action at this court, *see* 4 C.F.R. § 21.11, nothing prevented it from abandoning its GAO protest and pursuing temporary and permanent injunctive relief in this court.  *See Serco, Inc. v. United States*, 81 Fed. Cl. 463, 479 n.18 (2008) ("Of course, nothing prevents any of the plaintiffs from voluntarily dismissing their GAO protests and immediately filing in this court – as some did.").

[9] In this regard, it should also not be overlooked that because GEO delayed filing its GAO protest, there was no stay of performance during GAO's consideration of its protest.  Had GEO instead filed that protest within the ten-day period for invoking the stay, BOP presumably would not have been prepared to transfer prisoners at the completion of the current contract.  *See* 31 U.S.C. §§ 3533(d)(3)(A)(ii), 3533(d)(4).

compensated with money damages" (quoting *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 82 (2d Cir. 1994))); 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, Federal Practice and Procedure § 2944 (3d ed. 2010).

### C. Balancing of Harms

Under this factor, "the court must consider whether the balance of hardships leans in plaintiff's favor," requiring "a consideration of the harm to the government and to the intervening defendant." *Reilly's Wholesale Produce*, 73 Fed. Cl. at 715; *see also Serco*, 81 Fed. Cl. at 502; *Heritage of Am., L.L.C. v. United States*, 77 Fed. Cl. 66, 78-79 (2007); *PGBA*, 57 Fed.Cl. at 663.

While the mere delay of a contract is insufficient, standing alone, to avoid preliminary relief, *see*, *e.g.*, *PGBA*, 57 Fed. Cl. at 663, it appears that whatever harm that plaintiff will encounter if contract performance is not enjoined is outweighed by the harm that will be experienced by defendant and CFS if a restraining order is issued. For one thing, plaintiff's calculus fails to account for the significant administrative burdens associated with transfer of the 145 Federal inmates in question – and with reversing those transfer orders at the last instance. Further, plaintiff appears to discount the potential impact of delaying CFS' performance. Unlike GEO, CFS is a small, not-for-profit concern. To prepare for its performance, CFS has incurred significant payroll and rent obligations – in particular, it appears that CFS has incurred nearly $1 million in startup costs and has recruited, hired and trained thirty-eight individuals to prepare for the onset of the new contract. Logic and experience suggest that because of disparities in size, CFS would be far less able to weather the costs of a delay than GEO. This disparity cannot be ignored in concluding that the balancing of harms does not favor plaintiff here – particularly because, again, the "emergency" presented to the court is one precipitated by plaintiff's decisions on how to phase its protests of the subject procurement.

### D. Public Interest

"Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Software Testing Solutions, Inc.*, 58 Fed. Cl. at 538; *see also PGBA*, 57 Fed. Cl. at 663; *Cincom Sys. Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997); *Magellan Corp.*, 27 Fed.Cl. at 448. It is equally clear, however, that a procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion." *Aero Corp. S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997); *see also Magellan*, 27 Fed. Cl. at 448.

Judicial infringement on the procurement process would seem unwarranted here. Plaintiff's preliminary claims that the procurement process was compromised here have proven unsupported. To this point, it has not remotely shown that the CO's award decision here was arbitrary, capricious or otherwise contrary to law. That determination, balanced with the relative assessments of harm discussed above, leads the court to conclude that the public's interest lies in allowing the new contract to proceed.

### III. CONCLUSION

The court finds that the prerequisites for issuing a temporary restraining order have not been satisfied here. In consideration of the above:

1. Plaintiff's application for a temporary restraining order should be, and is hereby, **DENIED**.

2. As previously ordered, the court will conduct a status conference on August 1, 2011, to determine the schedule for further proceedings in this matter.[10]

**IT IS SO ORDERED**.

                    s/ Francis M. Allegra
                    Francis M. Allegra
                    Judge

---

[10] The court intends to unseal and publish this order after August 8, 2011. On or before August 5, 2011, each party shall file proposed redactions to this order, with specific reasons therefor.